ANTONIO GÓMEZ DE AGÜERO ET AL., Plaintiffs and Appellants, *v.* MANUEL BENIGNO GÓMEZ DE AGÜERO Y ALDEA ET AL., Defendants and Appellees.

No. 5831.   Argued February 16, 1933.—Decided March 16, 1934.

346

*H. Torres Solá* for appellants. *J. Guzmán Benítez* for appellees.

Mr. Justice Aldrey delivered the opinion of the court.

After the argument of this appeal, a motion was presented to us to dismiss the same upon the ground that we have no jurisdiction to decide it, in accordance with the case of *Ex parte Collazo,* 45 P.R.R. 592. It was decided in that case that in an *ex parte* proceeding to incorporate in a public instrument a holographic will, the decision which may be rendered is not appealable, in accordance with section 702 of the Civil Code (643 of the 1930 edition), in which it is provided that whatever may be the decision of the district court it shall be carried out, notwithstanding any opposition, without prejudice to any rights that the interested persons may have which they may enforce by appropriate action; but in the case at bar we are not confronted with an *ex parte* proceeding as in the *Collazo* case but with a contested suit to determine whether a letter constitutes a will and who are the persons to whom it refers. Consequently, the decision of the lower court being appealable in accordance with the provisions of subdivision 1, section 295, of the Code of Civil Procedure, we have jurisdiction to hear and decide the present appeal, and its dismissal does not lie.

The plaintiffs in this case are a brother and two sisters of Joaquín Gómez de Agüero Cordero, and have brought this action against the two children of the other brother of the plaintiffs, named Jesús, who died in 1918. The suit is for the purpose of declaring that a letter written by the brother Joaquín, who died in Barcelona, Spain, on November 11, 1929, at sixty years of age, contains his will and that it is in favor of the three plaintiffs. The complaint was dismissed on the merits, with costs, because the court below believed that the letter does not contain the will of Joaquín and because, even if it did, it would not be in favor of the three plaintiffs only.

In the appeal taken from that decision, the plaintiffs urge that the two grounds of said decision are erroneous and that the award of costs is likewise erroneous.

The letter which Joaquín Gómez de Agüero Cordero wrote and which is alleged to contain his will in favor of the three plaintiffs, is as follows:

"(Exhibit C)—Barcelona, October 10/29.—Dear Anita: Your letter of September 17 I have received today, the one which you addressed to the Rambla de Cataluña. From the bottom of my heart I regret that I cannot give you good news of myself, because since I arrived from San Sebastián I have grown worse to the extent that I have decided to be operated on, because I have a horrible fear of being bedridden here with a serious illness as things are going with me now. The pains there in San Sebastián affected me twice a day, but here they are continuous and even at night. Much have I regretted having left my country and my home, which however bad it may be is better than a foreign land. You can imagine what I am suffering mentally and physically.

"As I told you in one of my earlier letters, in my trunk in the inside pocket of a vest is my scarfpin and Emma has a part of the voucher of the letter of credit, the other is in the trunk. My wish is that what is mine be for you all (*ustedes*), giving a sum to a child named Ana Ma. Matos, in the place called Arenas de Utuado.

"Tomorrow I am going to talk with the surgeon. The doctor assures me that I shall be well, but to take this step you can imagine what I am suffering.

"Pray to God for me and know that my thoughts are on you all (*ustedes*).

"Love to all.

                                          "(Sgd.)   Joaquín."

The appellants contend that the terms of that letter are analogous to those of the letter in the case of *Ex parte Vázquez*, 34 P.R.R. 234, which we held contained a holographic will.

The act by which a person disposes of all his property or a portion of it, to take effect after his death, is called a will. It is so defined in section 616 of the Civil Code, 1930 edition. As a consequence of this provision, in order that there may be a will, it must appear that the person who made it had the will or deliberate intention of disposing of his property, to take effect after his death, as we said in the case of *Pastor* v. *Miró*, 34 P.R.R. 50, and in the *Vázquez* case, *supra*. That is the touchstone to determine whether the letter in question contains the will of Joaquín Gómez de Agüero.

From the reading of that letter it appears that when Joaquín Gómez de Agüero wrote it he was quite ill, he was suffering a great deal, and on the day before he had gone to the surgeon; that the doctor assured him that he would be well but for him to take that step, of going to the surgeon, he was suffering a great deal. All of these words and others in the letter show that the person who wrote it was aware that his life was in danger because, apart from his illness, he was going to undergo a surgical operation which almost always involves some risk of life for a person. That letter, written in that state of mind, after referring to where his scarfpin and a part of the voucher for his letter of credit could be found, also contains the following words: "My wish is that what is mine be for you all (*ustedes*), giving a sum to a child named Ana Ma. Matos, in the place called Arenas de Utuado." These words clearly, in our judgment, constitute the will of Joaquín Gómez de Agüero, because they not only

declare his wish "that what is mine be for you all," but also provide that there shall be a sum delivered to a named child, and the fact that he does not state the amount which should be delivered to the child does not vitiate the will. What is essential is that he was disposing of his property, and such voluntary disposition is clearly expressed in the letter. If to this are added the circumstances at the time in which the letter was written, the conclusion is readily reached that the letter constitutes the will of Joaquín Gómez de Agüero, because it disposes of his property in anticipation of death. This case is analogous to that decided by the Supreme Court of Spain and which is cited in *Pastor v. Miró, supra,* wherein it was stated in the letter declared to be a will: "In this, my first love letter, I make my will. Everything is for you, that you may always love me and never doubt the love of your Matilde." In the *Vázquez* case referred to above and in which we also found a letter to contain a will, the situation was similar to the one now before us, because in that case a person writing to his sister told her that he had an insurance policy and that he was telling her so because she was the only one of his sisters unmarried and that she was his sole heir.

As in the letter which Joaquín wrote to his sister Anita it is said that it is his wish that everything should be "for you all," the plaintiffs presented evidence for the purpose of showing that the letter refers to the three plaintiffs. From said evidence it appears that the three plaintiffs and their other two brothers, Joaquín and Jesús, were very close and lived in their parents' house in Río Piedras before and after the death of said parents; that the brother Jesús died in 1918 leaving two children by his marriage with Belén Aldea; that the latter, in representation of her two minor children, filed a suit in 1924 against the three plaintiffs herein and the brother Joaquín, alleging that the will of Jesusa Cordero, mother of the plaintiffs and of Joaquín and grandmother of the minor children of Jesús, was false; that that

suit vexed said plaintiffs and Joaquín very much and caused them to break off relations with the family of Jesús; that in the trips which Joaquín made to Spain he wrote letters every week to the said plaintiffs, addressing the letters to all or some of them, as appears from the letters presented.

From the evidence of the defendant niece and nephew, it appears, according to the testimony of Belén Aldea, mother of the defendants, that the Gómez de Agüero family were in fact very close and had much in common; that she and her husband were separated for thirteen years, Jesús living then with his brothers and sisters and she and the children living in the house of her brothers; that when her husband was taken ill he was in the house with his brothers and sisters, who had him confined in the Insane Asylum, which she found out after he was there, where he died; that when her mother-in-law got sick and died in 1923 she went to the house where the Gómez de Agüero family lived, that being her last visit to said family; that on account of the suit which she brought in the name of her children against their uncles and aunts after the death of their mother, the relations between her family and theirs were chilly, but that later they became reconciled and Joaquín was attentive to his niece and nephew and on his trips wrote them postal cards and made them small gifts; that when Joaquín went off to Spain the last time he did not come to tell his niece and nephew good-bye. The defendant Virginia admitted that the relations between both families became cold as a result of the suit, but she said that afterward there was a reconciliation and that she used to go to her uncles' house and that Joaquín on his trips used to write her postal cards, which were read at the trial, and that he used to send her pictures of himself, which were produced, and that he used to make her some small gifts. One witness, a suitor of Virginia, testified that on occasion he had accompanied her to her uncles' house. The other defendant and another witness said little on this point.

It frequently happens that when a separation occurs between a husband and wife and each goes back to live with his or her family, the friendly and family relations between the persons separated and their respective families disappear or are at least very limited, from which it is reasonable to assume that after the separation of Jesús Gómez de Agüero and his wife Belén Aldea the relations between the family of the husband, where he went to live, and the family of the wife, must have been pretty well broken off, as is shown by the fact that Belén went to the house of her children's uncles at the time their grandmother died, and has not been back to that house since. If to this we add the fact that the suit, in which she sought to establish as against the brothers and sisters of the deceased Jesús that the will of their mother was false, vexed them a great deal, as it would naturally vex any person, it is not difficult to conclude that the relations between the two families were terminated, as Belén Aldea recognizes; and if, in addition to this, we take into consideration the brotherly affection which Joaquín and his brother and two sisters had for each other, that they lived together, and that Joaquín used to write them very frequently, either to all three or to some of them for all three, without having mentioned in the letters introduced in evidence his niece and nephew, it is readily concluded that when he wrote to his sister, Anita, and told her that "my wish is that what is mine be for you all (*ustedes*)," he was referring only to them, to his brother and two sisters, the present plaintiffs, and not to his niece and nephew, under the circumstances.

The difficulty with the conclusion just stated is that the evidence presented by the defendants tended to show that even in spite of the hard feelings between the families on account of the suit, they later made up their differences and that the defendant Virginia used to visit her uncles' house and received postal cards from Joaquín when he was traveling and pictures of him and even a letter, which was not presented in evidence at the trial because it had been des-

352

troyed but the contents of which the court below, perhaps improperly, permitted to be stated in evidence orally as supplementary proof, over the objection of the plaintiffs; and that on that proof the court below based its opinion that even if the letter contained a will, the words "you all (*ustedes*)" did not refer to the plaintiffs only but also to their niece and nephew. It seems to us that even accepting the evidence of the defendants at its face value, the same is not sufficient in view of all the surrounding circumstances to overthrow the conclusion that when Joaquín wrote his letter-will to his sister Anita saying "my wish is that what is mine be for you all," he was referring only to his brother and two sisters with whom he lived for sixty years, with whom he was always so closely joined, and to whom he always addressed his letters when he was away from the Island. Apart from that, if he had wanted his property to be also for his niece and nephew, it would have been easy for him to say "for you all and my niece and nephew," as he did when he wanted the little girl in Utuado to be given some money.

The judgment appealed from must be reversed and another rendered instead sustaining the complaint on both points, without special imposition of costs.